**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> AIRRINGTON L. SYKES, <br><br> Defendant. | No. 17-CR-2009-LRR <br><br> **REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS** |

_____

## I.   INTRODUCTION

This case is before me pursuant to defendant's motion to suppress evidence allegedly seized in violation of the Fourth Amendment to the United States Constitution. (Doc. 11). The grand jury charged defendant in a one-count indictment with possession of a firearm as a felon. (Doc. 2). The charge arose from an incident on December 4, 2016, when Waterloo police officers encountered defendant while responding to a report at a laundromat where a woman found a loaded handgun magazine in a laundry basket. As a result of conducting a pat down search of defendant, officers discovered a handgun in his pants. In his motion to suppress, defendant argues that the officer lacked a reasonable articulable basis to conduct the pat-down search. Defendant argues, therefore, that the Court should suppress evidence of the firearm discovered as a result of the allegedly unlawful detention and search, and any incriminating statements defendant made after the firearm was seized.

The Honorable Linda R. Reade, United States District Court Judge, referred this motion to me for a report and recommendation. On Monday, April 17, 2017, I held an

evidentiary hearing on defendant's motion at which Waterloo Police Officers Ryan Muhlenbruch and Luke Lamere testified, and the Court admitted into evidence a videotape from Officer Muhlenbruch's body camera (Exhibit A), and the officers' reports (Exhibit 1).  At the conclusion of the hearing, I invited the parties to submit additional legal authority regarding two of the sub-issues identified below.  Each party submitted additional authorities and arguments in emails they sent me.

For the reasons that follow, I respectfully recommend that the Court deny defendant's motion to suppress.

## II. FINDINGS OF FACT

On December 4, 2016, at approximately 11:50 p.m., Waterloo Police Officer Ryan Muhlenbruch was dispatched to a laundromat in Waterloo, Iowa.  Officer Muhlenbruch drove an unmarked police car.  There, he met with a patron, Angie Lindsey, in the parking lot in front of the laundromat, approximately 100 feet away from the front door.  The front of the laundromat has large plate-glass windows on either side of double doors.  The double doors are glass doors.

Lindsey told Officer Muhlenbruch that she found a loaded .40 caliber handgun magazine in a laundry basket she was using while inside the laundromat.  Lindsey gave the magazine to Officer Muhlenbruch.  Lindsey stated that she had taken some of her clothes out of one of the dryers in the laundromat and placed them in a laundry basket.  There was no handgun magazine in the laundry basket at that time.  When Lindsey later took her clothes back out of the basket, she found the loaded handgun magazine in the basket.  Lindsey told Officer Muhlenbruch that there were only two other males in the laundromat at the time, and that she had seen them near the laundry basket at one point.  Lindsey emphasized that she did not know if those males had anything to do with the magazine, but that they were the only other people present at the time.  Finally, Lindsey

2

told Officer Muhlenbruch those same two men were still in the laundromat, having just walked back into the laundromat from their car.

By the time Officer Muhlenbruch arrived, there were several more people in the laundromat. Officer Muhlenbruch had Lindsey look into the laundromat from the parking lot and describe which of the people inside the laundromat were the men she saw present when she found the handgun magazine. Lindsey described the two men as black males wearing black clothes. By this time, there was another person wearing tan standing with those two men. Lindsey stated the person in tan was not present at the time she found the handgun magazine. The entirety of this conversation is captured on Officer Muhlenbruch's body camera and I only summarize it here. (Exhibit A).

Officer Muhlenbruch requested assistance and Officer Lamere responded to the laundromat. Officer Lamere drove a marked police vehicle. He pulled up in front of the laundromat as Officer Muhlenbruch approached the laundromat on foot from the parking lot. The officers approached from the left side of the laundromat, crossing in front of two large plate-glass windows on the left side of the glass entrance door. Defendant was standing in an aisle inside the laundromat on the left side, approximately twenty feet from the front windows. It appears from the video that defendant was facing the windows at the time.

Officers Muhlenbruch and Lamere, both in uniform, then entered the laundromat. They approached the two men identified by Lindsey, who were standing in an aisle on the left side of the laundromat. Defendant was still facing the front of the laundromat when the officers entered. As the officers approached, defendant turned and walked briskly toward the back of the laundromat. Officer Muhlenbruch testified that he did not

make eye contact with defendant before defendant turned, but Officer Lamere said he did make eye contact with defendant before defendant turned and walked away.[1]

Officer Muhlenbruch quickly followed defendant, taking a different route between the washing machines. Officer Muhlenbruch could see defendant's head, but could not see the rest of his body until they both emerged from rows of machines in an aisle on the right side of the laundromat. Defendant had passed an exit in the rear of the laundromat and entered a bathroom. Officer Muhlenbruch reached the bathroom just as defendant had entered it and closed the door. Officer Muhlenbruch opened the door and asked defendant to come out of the bathroom, indicating he just needed a minute of defendant's time. Defendant complied. Officer Muhlenbruch grabbed hold of the sleeve of defendant's sweatshirt and guided defendant out of the bathroom. Officer Muhlenbruch testified that he did not see a bulge in defendant's clothing indicative that defendant was armed at any time during his encounter with defendant.

Officer Muhlenbruch asked for defendant's identification, but defendant indicated that he did not have any identification. Officer Muhlenbruch then announced that he was going to pat down defendant for weapons. Officer Muhlenbruch still had a hold of defendant's sleeve and he directed defendant in a manner to face the wall. In response and as defendant was turning toward the wall, defendant said something like "I got my homey's" and pointed toward his waist. Officer Muhlenbruch interpreted this to mean that defendant was armed.

---

[1] The video from Officer Muhlenbruch's body camera is not terribly helpful regarding eye contact. The camera was apparently located on the front of his chest, so does not show what can be seen by the officers' eyes a foot or so above the location of the camera. The washing machines in the laundromat are just tall enough that they blocked the view of defendant until Officer Muhlenbruch rounded the corner and entered the aisle where defendant was standing. The video does clearly show, however, that defendant does not turn around and walk away until the officers rounded the corner and entered his aisle.

Officer Muhlenbruch then conducted a pat-down search of defendant and recovered a Smith & Wesson .40 caliber handgun from defendant's left front pants pocket. The firearm contained a loaded magazine. Officer Muhlenbruch advised defendant of his rights. Defendant waived his rights, stated he was a felon, and admitted he had the handgun because his friend, Michael Liggons, the other male in the laundromat, had given him the gun to hold while they were in the laundromat.

Officer Lamere spoke with Liggons. Liggons told Officer Lamere that the firearm was his and that he had a permit to carry a concealed weapon, which he showed to Officer Lamere. Liggons explained that he had given the gun to defendant to hold because Liggons was not wearing a belt and therefore could not carry the gun. Liggons admitted knowing defendant was a felon.

Officer Muhlenbruch described the area immediately behind the laundromat as a low income housing area. He testified that it was neither a low crime or a high crime area. He indicated that he had been on multiple calls to the low income area for fights, other disturbances, and at least one "shots fired" call within the last two years. He also indicated that he had been called to the parking lot of the complex where the laundromat was located sometime in the past, but he could not recall when. During that call, officers had seized a firearm from a suspect.

Officer Muhlenbruch has been on the Waterloo Police Department for 14 years, and has always been on patrol duty. He graduated from the Iowa Law Enforcement Academy and receives continuous training, especially as a member of the police department's tactical response unit. He testified that in the last several years he has seized firearms from suspects on three to five occasions. None of those suspects had a permit to carry a concealed weapon, although he testified that it is an increasingly common occurrence to encounter people with permits to carry concealed weapons.

Officer Lamere has been on the Waterloo Police Department for 8 years and has always been on patrol duty. He graduated from the Iowa Law Enforcement Academy and receives continuous training. He is also a member of the police department's tactical response unit.

I found both Officers Muhlenbruch and Lamere to be credible witnesses.

### III. APPLICABLE STANDARDS

An officer may stop an individual if the officer has reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); s*ee also United States v. Harris*, 747 F.3d 1013, 1016 (8th Cir. 2014). A *Terry* stop is justified when a police officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *see also United States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015). In deciding whether to conduct a *Terry* stop, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation. *See*, *e.g.*, *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) (reasonable suspicion may be based on information known not only to the officer at the scene, but also on information known to other law enforcement personnel at the time, even if not communicated to the officer at the scene); *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005) (same); *United States v. Robinson*, 119 F.3d 663, 666–67 (8th Cir. 1997) (same). Further, an officer may conduct a protective pat down if he has reasonable suspicion that the person "is potentially armed and dangerous." *United States v. Cotton*, 782 F.3d 392, 396 (8th Cir. 2015) (internal quotation marks and citation omitted).

Officers must employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the

*Terry* stop. *See Florida v. Royer*, 460 U.S. 491, 500 (1983). A *Terry* stop may transform into an arrest, requiring probable cause, "if the stop lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (citation omitted). As part of a lawful *Terry* stop, however, officers may take any measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985).

A court must determine whether reasonable suspicion exists based on "the totality of the circumstances, in light of the officer's experience." *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009) (quotation omitted). What constitutes reasonable suspicion is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995). When evaluating whether reasonable suspicion exists, courts must "view the [officers'] observations as a whole, rather than as discrete and disconnected occurrences." *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002) (rejecting court of appeal's reasonable suspicion analysis where the "court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances'").

### IV.   ANALYSIS

Defendant argues Officer Muhlenbruch violated his rights under the Fourth Amendment to the Constitution when the officer conducted an unlawful pat-down search because there was no basis for a reasonable suspicion that defendant was engaged in

criminal conduct or was armed. This motion raises three sub-issues, in my view. First, does the possibility that defendant had a concealed weapons permit (as did his friend) negate the presumption that he was carrying a concealed weapon in violation of Iowa law? Second, in determining whether the officer had a reasonable basis to determine if defendant was armed, could the officer consider defendant's statement and gesture that he had his "homey's"? In other words, when did the officer's pat-down search begin? Third, were the facts known to the officer when he began his pat-down search sufficient to give rise to a reasonable suspicion that defendant was armed and dangerous? The Court will address each of these questions in turn.

### A.     *What Difference Does the Possibility of a Permit to Carry Make?*

Defendant argues that the pat-down search was unlawful in part because there was no crime afoot for the officers to investigate when mere possession of a firearm is not necessarily illegal. Defendant emphasizes the possibility that defendant could have had a permit to carry a concealed weapon just, as it turned out, Liggons did. Lindsey had not reported that defendant or anyone else had brandished a firearm, threatened anyone with it, or committed any other illegal activity with a firearm. Therefore, defendant argues, when the officers arrived at the laundromat, they had no reason to believe that any crime had been or was being committed. Defendant relies on *United States v. Ubiles*, 224 F.3d 213, 218 (3rd Cir. 2000), for the proposition that a report of a firearm possession "gives rise to neither sufficient belief that criminal activity is afoot, nor that the possessor is dangerous." (Doc. 11-1, at 2-3).

I begin with finding that there was a reasonable articulable basis for officers to believe that one of the two men dressed in black inside the laundromat was carrying a concealed weapon. The information provided by the witness was sufficient for officers to reach that logical conclusion. She found a loaded handgun magazine in a laundry

8

basket she had been using and the only other people in the laundromat at the time were the two men dressed in black. And those men had been near the laundry basket.

It is illegal in Iowa to carry a concealed weapon, including a handgun. Iowa Code § 724.4[2]. It is an affirmative defense to the offense, however, if a defendant can prove that he or she has a valid permit to carry a concealed weapon. The government does not, however, have to prove as an element of the crime that the defendant did not have a valid permit. *See State v. Bowdry*, 337 N.W.2d 216, 218-19 (Iowa 1983) (holding that the absence of a permit to carry a concealed weapon is not an element of the offense itself which the government must initially prove).

I find that *Ubiles* is easily distinguishable. That case arose in the Virgin Islands. It is not illegal to possess a concealed firearm in the Virgin Islands. *Ubiles*, 224 F.3d at 217-28. It is illegal there to possess a gun with an altered serial number, or an unregistered firearm, but mere possession of a firearm by itself is not a crime. In Iowa, on the other hand, it is. Although it may be an affirmative defense for a person to have a permit to carry a concealed weapon, officers do not have to eliminate the possibility of affirmative defenses before they can find reasonable suspicion that a crime, in this case possession of a concealed firearm, is afoot.

Indeed, the Third Circuit itself has distinguished the holding in *Ubiles* based on the same reasoning. In *United States v. Gatlin*, 613 F.3d 374, 378-79 (3rd Cir. 2010), the case arose in Delaware and the only information officers had was that the defendant was carrying a concealed weapon. The court found that evidence sufficient, distinguishing *Ubiles* because in Delaware possession of a concealed weapon is presumptively illegal and a concealed weapons permit is an affirmative defense, while in the Virgin Islands the government has the affirmative burden of proving a person does

---

[2] Iowa Code § 724.4 was amended on April 13, 2017. *See* 2017 Iowa Legis. Serv. 64 (West) (amending Section 724.4(4)(b) pertaining to peace officers). This does not alter my analysis.

9

not have a concealed weapons permit. *Id*. *See also*, *e.g.*, *United States v. Collins*, Civil Action Nos. 05-1810, 01-CR-00780, 2007 WL 4463594, at *3 (E.D. Penn. Dec. 19, 2007) (distinguishing *Ubiles* on the ground that in Pennsylvania, it is a crime for a person to carry a concealed weapon and the government does not have to prove as an element of the crime that the defendant did not have a permit to carry a concealed weapon). *See also United States v. Montague*, 437 Fed. App'x 833, 836 (11th Cir. 2011) (rejecting premise that officers cannot conclude that criminal activity is afoot simply because a person might have a permit to carry a concealed weapon because the absence of a permit is not an element of the offense).

In his post-hearing email submission, defendant cited *Commonwealth v. Couture*, 552 N.E.2d 538, 541 (Mass. 1990) for the proposition that "[t]he mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun, and the stop was therefore improper under Fourth Amendment principles." I found a similar holding in *Regalado v. State*, 25 So. 3d 600, 604 (Fla. Dist. Ct. App. 2009), where a Florida state court held that evidence that a person is carrying a concealed firearm is not alone sufficient to give rise to a reasonable suspicion of criminal activity. These state court decisions are, of course, not binding. Nor do I find their reasoning correct. Indeed, other Florida courts rejected *Regalado*, as have federal courts in Florida. *See*, *e.g.*, *United States v. Spann*, No. 15-20070, 2015 WL 1969111, at *5 (S.D. Fla. May 1, 2015) (rejecting idea that officers have to eliminate the possibility of an affirmative defense before finding reasonable suspicion of criminal activity); *United States v. Montague, Jr.*, No. 10-20638-CR, 2010 WL 3294289, at * 6-8 (S.D. Fla. Jul. 27, 2010), *report and recommendation adopted*, No. 10-20368-CR, 2010 WL 3294283 (S.D. Fla. Aug. 20, 2010) (same, and collecting cases).

In sum, although states, including Iowa, appear to be increasingly granting permits for citizens to carry concealed weapons, that does not detract from an officer's basis to

have a reasonable suspicion of criminal activity when reasonable articulable facts lead an officer to believe a person may possess a concealed handgun.  As the Supreme Court has recognized, firearms are dangerous and officers must be able to respond to the potential that people are armed in a manner that provides for their own and the public's protection. *See Florida v. J.L.*, 529 U.S. 266, 272 (2000) ("Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry's* rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern."). That means that no matter how prevalent concealed weapons permits become, an officer need not eliminate that possible affirmative defense to the crime of carrying a concealed weapon before conducting a pat-down search when the officer otherwise has a reasonable basis to believe the suspect is carrying a concealed weapon.  In other words, as the Court in *Gatlin* stated, possession of a concealed handgun in Iowa is presumptively illegal.  That is not to say, however, that officers can ignore evidence suggesting a person has a concealed weapons permit.  If the officer is aware of facts that suggest a suspect is authorized to carry a concealed weapon, then the officer may need to investigate further before concluding that criminal activity is taking place.  There is nothing in the facts of this case, however, that would have led a reasonable officer to believe defendant had a concealed weapons permit.

Therefore, I find there were reasonable articulable facts to believe that criminal activity was occurring; that is, that one of the two men in the laundromat identified by the witness was committing the offense of carrying a concealed weapon.  I further find that officers did not have to eliminate the possibility that the men had concealed weapons permits before conducting a *Terry* stop of them to further investigate the crime.

### B. *When Does a Pat-Down Search Begin?*

Having determined that the officers did not have to eliminate the possibility that the two men had permits to carry a concealed weapon before believing that one of them may be committing the offense of carrying a concealed weapon, the question then becomes what evidence did the officer have to suggest defendant was the one carrying a concealed weapon. "The reasonableness of official suspicion [for purposes of a pat-down search] must be measured by what the officers knew before they conducted their search." *J.L.*, 529 U.S. at 271. Here, the government argues that defendant's statement, "I've got my homey's" and defendant's gesture toward his pants, are among the facts that give rise to a reasonable suspicion that defendant was armed. I agree that a reasonable officer could interpret the statement and gesture as indicating that defendant was armed. The question, though, is whether the pat-down search had already begun when defendant made that statement and therefore cannot be considered as among the facts justifying the pat-down search in the first instance.

There appears to be very little case law on this precise question. There are some obvious parameters to this analysis, however. Clearly an officer has not initiated a pat-down search when the officer has formulated the intent to do so, but has not articulated that intent verbally to the suspect. *See United States v. Tinnie*, 629 F.3d 749, 752-53 (7th Cir. 2011) (finding that a pat-down search had not begun simply because the officer had formed the mental intention of conducting a pat-down search, and therefore statements and the absence of responses by defendant when asked to exit a vehicle could be considered in determining if the officer had a reasonable basis to believe the defendant was armed and dangerous). On the other hand, clearly a pat-down search has started when an officer physically begins patting down the outside of a suspect's clothing, regardless of whether the officer announces the intent or explains the conduct.

This case presents a set of facts between those two bookends. Here, the officer told defendant that he was going to conduct a pat-down search. The officer was also holding onto the sleeve of defendant's sweatshirt and directing defendant's body against the wall at the time. The officer did this before defendant made any statements or gestures indicating he had a firearm.[3]

I could find one decision with somewhat similar facts. In *United States v. Key*, 621 Fed. App'x 321 (6th Cir. 2015), officers stopped several men wearing heavy coats in the middle of summer as they were walking in the street late at night. Officers approached them, asked for identification, and announced an intention of patting them down for weapons. The defendant stated "Oh, I have nothing on me and you can check me. I am good." When officers attempted to pat-down the defendant, however, he began to walk away from the officers. He continued to walk away despite commands not to, so officers pushed the defendant against the police car, at which time the defendant told the officer he had a gun. In *Key*, the court stated that any one of the facts, including the defendant's statement, was sufficient to establish a reasonable basis to believe the defendant was armed. *Key*, 621 Fed. App'x at 323. The problem with the analysis in Key, however, is that the opinion did not discuss when the pat-down began. It does not appear from the opinion that the defendant challenged the use of his admission in determining reasonable cause to conduct a pat-down search. Accordingly, I find the *Key*

---

[3] In his post-hearing email submission, defendant emphasizes that Officer Muhlenbruch stated in his report: "I had him face the wall and started a pat down for weapons. Sykes then started mumbling something." Exhibit 1. I find the officer's report irrelevant to this analysis. What the officer believed he was doing is first subjective and second a legal conclusion. Fourth Amendment analysis is objective; the subjective beliefs of the officer are irrelevant in determining the constitutionality of the officer's conduct. Moreover, the officer's own legal interpretation of his conduct is not binding on this Court. Nor should defendant want it to be. For example, had the officer written "I had him face the wall but had not yet started a pat down for weapons when Sykes started mumbling something," then defendant would not suggest the Court should be bound by the officer's legal interpretation of his conduct.

decision's holding regarding use of the defendant's admission to be dictum regarding the precise question posed here.

I find that the pat-down search began in this case before defendant made the statement about having "my homey's" or gesturing toward his pants. The officer told defendant he was going to conduct a pat-down and was physically directing defendant's movement against the wall for the purpose of conducting the pat-down. Defendant made the statement and gesture only in response to the officer's statement and conduct initiating the pat-down search. I find that in determining whether reasonable suspicion existed for a pat-down search, the Court cannot rely on defendant's statement and gesture because they occurred after the officer began the pat-down search. In other words, either the officer had reasonable suspicion to believe defendant was armed before that or not; the officer cannot use evidence obtained from the pat-down search to justify the pat-down search.

### C. *Was There A Reasonable Basis to Conduct the Pat-Down Search?*

The final question is whether (ignoring defendant's statement and gesture) Officer Muhlenbruch had a reasonable basis to believe defendant was armed and dangerous sufficient to justify a pat-down search of defendant. I find that he did and that the pat-down search was lawful.

There are a number of objective facts from which a reasonable officer of similar experience could conclude that a crime was afoot (possession of a concealed weapon) and that defendant possessed a firearm. The reporting citizen, Lindsey, indicated that defendant was one of two males near the laundry basket in which she found a loaded handgun magazine. I have already found the officers had a reasonable articulable basis to believe that one of those two males were carrying a concealed weapon in violation of Iowa law. It was near midnight and thus dark outside, although the laundromat was well-

lit and the parking lot in front of the laundromat reasonably well-lit. The area immediately behind the laundromat was known for some criminal activity, including at least one shots fired incident in the preceding two years. The officers approached the laundromat in front of large plate-glass windows, both dressed in uniforms clearly identifying them as police officers. When they entered the laundromat, defendant made eye contact with Officer Lamere, then turned abruptly and walked briskly away from the officers toward the back of the laundromat. Defendant's companion, in contrast, did not walk away from the officers when they entered the laundromat.

    I find that a reasonable officer could believe, based on these facts, that defendant was in possession of a concealed handgun and would be justified in conducting a pat-down search for the safety of the officer and others before further investigating the case. When an officer harbors a reasonable suspicion that a person is armed, a *Terry* pat-down search is warranted. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009). A reasonable suspicion does not require "absolute[ ] certain[ty]." *Terry*, 392 U.S. at 27. The facts gave rise to a reasonable suspicion that one of the two men wearing black in the laundromat was carrying a concealed weapon. The Supreme Court has held that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Defendant's conduct in walking briskly away from the officers when they entered the laundromat singled him out and gave rise to a reasonable suspicion that he was the one carrying the concealed firearm. *See, e.g.*, *United States v. Trogdon*, 789 F.3d 907, 911 (8th Cir. 2015) (suspect's conduct in "walking briskly around the building toward a blocked-off street where it would be difficult to follow" after seeing police officers gave rise to a reasonable suspicion); *United States v. Horton*, 611 F.3d 936, 939 (8th Cir. 2010) (finding reasonable suspicion to believe the defendant was armed because, among other things, he "briskly walked away" from police officers). *See also United States v. Sharp*, No. 11-CR-197, 2013 WL

4522929, at *11 (E.D. Wis. Aug. 27, 2013) (finding reasonable cause to pat-down a suspect who walked up to a drug house during a search, but walked briskly away when he made eye contact with a police officer); *Hadley v. United States*, No. 1:09-CV-278, 2010 WL 2573490, at *4 (W.D. Mich. June 22, 2010) (finding that a suspect's conduct in walking briskly away from officers gave rise to a reasonable suspicion to support a pat-down search).

Defendant posits that his conduct in walking toward the bathroom was itself lawful and not necessarily suspicious, even with him walking briskly, because it is not unreasonable to believe that a person who urgently needs to use a restroom may walk briskly to go do so. The Supreme Court has noted that even where all of the suspect's conduct is lawful and could be susceptible to an innocent explanation, officers may conduct a *Terry* stop where that same conduct is also susceptible to an interpretation of criminal activity. *Wardlow*, 528 U.S. at 125. *See also United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (holding that it is "not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt."). *Terry* permits a limited intrusion into a person's freedom to allow a limited detention or search, recognizing that it is possible that the person may be engaged in lawful conduct.

Defendant suggests in his brief that Officer Muhlenbruch could have taken other, less-intrusive steps than patting down defendant, and argues that had the officer let defendant enter the bathroom it would have decreased the danger because defendant may have discarded the weapon, eliminating the danger. The government responds, based in part on Officer Muhlenbruch's testimony about his subjective fears, that allowing defendant to enter the bathroom may have increased the risk because for all Officer Muhlenbruch knew, defendant may have been entering the bathroom to ready the firearm for use. It is true that the methods employed in a *Terry* stop "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of

16

time." *Florida*, 460 U.S. at 500. "However, as part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *Newell*, 596 F.3d at 879 (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). As this Court has previously stated, "[a]lthough officers must use the least intrusive means in relation to the scope and duration of a *Terry* stop in order to dispel reasonable suspicion, this does not mean that they must think creatively of every possible means of doing so short of conducting a pat down of a potentially armed suspect." *United States v. Meier*, No. 16-CR-3013-LTS, 2016 WL 6305954, at *6 (N.D. Iowa Oct. 26, 2016). I find Officer Muhlenbruch's decision to stop defendant before defendant entered the bathroom where the officer would have lost sight of him and his actions, at a time the officer had reasonable suspicion to believe defendant was armed with a handgun, to be reasonable under *Terry* and the Fourth Amendment.

## V. CONCLUSION

In summary, I find the officer had a reasonable articulable basis to believe that defendant was engaged in criminal activity (carrying a concealed weapon) and had a reasonable basis to believe defendant was armed sufficient to justify a pat-down search. For the reasons set forth above, I respectfully recommend the Court **deny** defendant's motion to suppress (Doc. 11).

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the

district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 21st day of April, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa